

**ORDERED in the Southern District of Florida on June 19, 2020.**

　　　　　　　　　　　　　　　　Robert A. Mark, Judge
　　　　　　　　　　　　　　　　United States Bankruptcy Court
_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re: | Case No. 17-10703-BKC-RAM |
| MIAMI NEUROLOGICAL INSTITUTE, LLC, | Chapter 7 |
| 　　Debtor. | |
| SONEET R. KAPILA, Trustee, | |
| 　　Plaintiff, | |
| vs. | Adv. No. 18-01435-BKC-RAM-A |
| UNIVERSITY OF MIAMI, | |
| 　　Defendant. | |

**MEMORANDUM OPINION**

　　While insolvent, the debtor in the underlying chapter 7 case

1

(the "Debtor") paid tuition to the University of Miami ("UM") for its principal and two other executives to enroll in an executive MBA program. The chapter 7 trustee's constructive fraud claims against UM in this proceeding present one discrete but challenging issue. Did the Debtor receive reasonably equivalent value in exchange for the tuition payments?

At the October 2, 2019 trial, UM (1) established that the Debtor had a reasonable belief that the graduate training of its executives would yield a positive return by improving the company's business performance; and (2) presented unrebutted evidence that the educational training of its principal provided value to the Debtor by improving the collection of sizable accounts receivable. Because the Plaintiff trustee (the "Trustee") did not rebut the evidence that the Debtor received value and did not prove that the value was not equal to the tuition payments, the Court finds that the tuition payments paid for the Debtor's principal are not recoverable as fraudulent transfers.

## Factual and Procedural Background

The Debtor, Miami Neurological Institute, LLC, operated neurological surgery and care centers from leased facilities throughout South Florida. The Debtor's principal and 100% owner is Santiago Figuereo ("Dr. Figuereo"), a neurosurgeon. At trial,

2

Dr. Figuereo testified that the Debtor filed its chapter 11 petition on January 20, 2017 (the "Petition Date") to avoid eviction from its main facility in Aventura, Florida.

The chapter 11 case derailed quickly. The Debtor's primary secured creditor, City National Bank of Florida ("CNB") moved, *ore tenus*, to convert the case to chapter 7 at a cash collateral hearing on February 3, 2017. At the hearing, the Debtor and CNB agreed to the appointment of a chapter 11 trustee and, on February 7, 2017, the Court entered an order directing the appointment of a chapter 11 trustee. [DE #48, Case No. 17-10703]. On February 8, 2017, Soneet Kapila was appointed as Trustee. [DE # 52 in Case No. 17-10703].

At a status conference on February 13, 2017, the Trustee reported that a successful reorganization was not feasible and moved, *ore tenus*, to convert the case. On February 15, 2017, less than a month after the Petition Date, the Court entered its Order Converting Case Under Chapter 11 to Case Under Chapter 7. [DE #82, Case No. 17-10703].

By all accounts, delayed collection of accounts receivable resulted in a liquidity crisis that caused the Debtor to fail. The Trustee testified that the Debtor's average annual billings approximated $40-60 million but that collections averaged between

3

11 and 12% of annual billings, yielding no material profit.

Although the Trustee did not testify as an expert, he expressed his view that the Debtor was hopelessly insolvent as early as 2015. The Debtor was delinquent on its rent under several leases and had not funded or paid payroll taxes for some quarters of 2015 and 2016, resulting in an IRS claim exceeding $2 million. *See* Pl.'s Ex. 18 (IRS proof of claim). The Trustee also testified that the Debtor was burdened with substantial secured debt and, in the months preceding the bankruptcy filing, borrowed from a high-interest lender-of-last-resort. When the Trustee took over operations in 2017, he found the business already was effectively closed, and no patient services were provided after his appointment as Trustee.

Dr. Figuereo did not dispute that the Debtor was experiencing a cash-flow crisis when it filed its chapter 11 petition. Dr. Figuereo testified that the Debtor's operations grew significantly between 2008 and 2013, and in 2014, it became apparent that the company needed to address business problems, including those arising from growing receivables and poor collection rates. Dr. Figuereo testified that he had no specialized business training and needed to improve his management skills in the business of medicine. With the approval of the Debtor's board, he decided

4

that one way to enhance productivity and improve the Debtor's cash flow would be to invest in specialized training for three of the Debtor's executives, himself, Juan Ramirez ("Ramirez"), and Nicolas Lembert ("Lembert", and together with Ramirez and Dr. Figuereo, the "Executives").  Although the Defendant did not introduce documentary evidence reflecting the corporate decision, Dr. Figuereo's testimony regarding the Board decision was credible and unrebutted.

The Executives enrolled in the University of Miami's ("UM") Executive HealthCare Masters of Business Administration Program ("HEMBA").  Dr. Figuereo testified that HEMBA is a two-year program with tuition exceeding $100,000 and classes one weekend per month.  Dr. Figuereo began his education in the beginning of 2016 and completed the program at the end of 2017.  Lembert and Ramirez deferred their start for personal reasons and did not start their classes until the beginning of 2017, around the Petition Date.  Because Lembert and Ramirez did not start their program until just prior to the Petition Date, the Debtor did not receive any value for tuition payments made on behalf of Lembert or Ramirez, and the Trustee may avoid and recover the tuition paid on their behalf.  That leaves only the payments made for Dr. Figuereo's tuition in dispute.

5

The only other witness at trial besides the Trustee and Dr. Figuereo was Dr. Stephen Ullman, the Director of Health Management & Policy at UM.  Dr. Ullman testified that UM's HEMBA currently is ranked as the number one healthcare MBA program in the United States.  The program provides post-graduate courses for health care professionals with at least seven years of experience.  The courses and training develop practical skills that can be implemented by the students in their businesses.  Referring to Dr. Figuereo's transcript (Def.'s Ex. I), Dr. Ullman described some of the courses taken by Dr. Figuereo, including Analysis of Financial Statements, Essentials of Health Care Administration, and Health Care Organization Economics and Ethics.

Dr. Ullman testified that between one third and one half of the students had their tuition paid by their employer.  He described some of the benefits of the program, including networking with over 1,000 graduates in the health care field, developing accounting and business skills, learning strategies to reduce costs and enhance revenues, and developing strategies to negotiate more favorable reimbursement rates with insurers.  Dr. Ullman also provided specific examples of cost-cutting and revenue-increasing measures that were implemented by former students who obtained HEMBAs at UM.

6

Dr. Figuereo's testimony corroborated Dr. Ullman's high praise for UM's HEMBA program.  Dr. Figuereo described the ways in which he implemented what he learned in striving to save his business, such as completing a school project that helped him reorganize his collection department resulting in improved collection rates and collection time.  He recalled a graph indicating that the average collection time decreased from over 120 days to less than 60 days.  Dr. Figuereo also testified that Dr. Ullman personally helped him attempt to negotiate higher reimbursement rates with Blue Cross.

Although Dr. Figuereo's hopes to turn around the company were not realized, the Court is persuaded that his decision to enroll in the HEMBA program was motivated by his desire to help the company, not for his personal benefit.  He testified that he deferred his salary for over a year and, in late 2016, Dr. Figuereo mortgaged his home to provide the Debtor with a $350,000 line of credit.  He also testified that he did not believe that the Debtor's financial condition was hopeless on the Petition Date.  He conceded that the Debtor's cash flow did not sustain its operations, but he still believed that the company could be reorganized.  He testified that collection rates were improving significantly, and he was hopeful that the Debtor could restructure

7

its debts.

The payments identified in the chart below (collectively, the "Transfers") are the sole payments subject of the Trustee's avoidance claims.[1] The payments total $68,654.40, consisting of a single $6,242.57 tuition or enrollment payment for Lembert, two payments totaling $8,242.57 for Ramirez, and five payments totaling $54,169.26 for Dr. Figuereo.

| Transaction Dated | Check Cleared | Payee | Amount | Student ID Number |
|---|---|---|---|---|
| 1/19/16 | Webpay | University of Miami | $6,042.00 | 5406518 (Santiago Figuereo) |
| 3/3/16 | Webpay | University of Miami | $12,125.92 | 5406518 (Santiago Figuereo) |
| 3/8/16 | Webpay | University of Miami | $6,000.00 | 5406518 (Santiago Figuereo) |
| 11/21/16 | 11/25/16 | University of Miami | $24,001.06 | 5406518 (Santiago Figuereo) |
| 12/9/16 | Webpay | University of Miami | $2,000.00 | 54236474 (Juan Ramirez) |
| 12/22/16 | 1/4/17 | University of Miami | $6,242.57 | 54215095 (Nicolas Lembert) |
| 12/22/16 | 1/4/17 | University of Miami | $6,242.57 | 54236474 (Juan Ramirez) |

---

[1] The initial Joint Pretrial Stipulation filed by the parties indicates that payments totaling only $60,411.83 are at issue [DE #11]. However, at trial, the parties agreed that Plaintiff's Exhibit "1", which describes payments totaling $68,654.40, accurately identifies all transfers at issue in this proceeding.

8

| | | | | |
|---|---|---|---|---|
| 12/22/16 | 1/4/17 | University of Miami | $6,000.28 | 5406518 (Santiago Figuereo) |
| TOTAL | | | $68,654.40 | |

The Debtor and UM stipulated that the Debtor made the payments during the applicable look-back period and in a state of insolvency that satisfies the applicable standard for avoiding constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B)(ii). [DE #11, 25]. It is also undisputed that the Debtor did not enter into a contract with UM obligating the Debtor to make the tuition payments. Moreover, there were no employment or other agreements between the Debtor and its Executives that obligated the Debtor to pay for their UM tuition.

## Discussion

The Plaintiff filed a four-count complaint (the "Complaint") [DE #1] to avoid the Transfers as either constructive frauds under Fl. Stat. §§ 726.105(1)(b), 726.106(1), or 11 U.S.C. § 548(a)(1)(B) (Counts 1 through 3), or as preferences under 11 U.S.C. § 547(b) (Count 4). The Plaintiff did not pursue the preference claim, so the Court tried only the first three counts of the Complaint, all of which seek avoidance of constructively fraudulent transfers.[2]

---

[2] "[T]he Florida constructive fraudulent transfer statutes are 'analogous in form and substance' to § 548(a)(1)(B) of the

9

By agreement of the parties,[3] the sole disputed issue for trial was whether the Debtor received reasonably equivalent value in exchange for enrollment or tuition payments made to UM on behalf of the Debtor's Executives, and if not, the extent (if any) to which UM might offset its liability by way of a good faith defense.

"To determine whether a debtor received 'reasonably equivalent value,' a court must address two distinct inquiries: whether value was received and whether the value received is reasonably equivalent to the value of the property transferred." *Pettie v. Ringo (In re White)*, 559 B.R. 787, 800 (Bankr. N.D. Ga. 2016); *see also In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an

---

Bankruptcy Code." *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 Fed. Appx. 925, 928, n.6 (11th Cir. 2015) (citation omitted). *See, for example, In re Phoenix Diversified Inv. Corp.*, No. 08-15917-EPK, 2011 WL 2182881, at *4 (Bankr. S.D. Fla. June 2, 2011) (describing the similar meaning and analyses of "value" under section 548 of the Bankruptcy Code and section 726 of the Florida Statutes); *In re Leneve*, 341 B.R. 53, 56 (Bankr. S.D. Fla. 2006) (plaintiff bears burden of proving that the debtor did not receive reasonably equivalent value under section 548 of the Bankruptcy Code and section 726 of the Florida Statutes).
[3] *See* Joint Pretrial Stipulation [DE #11] (parties stipulate as to the payments made by the Debtor during the applicable look-back period); Supplemental Joint Pretrial Stipulation [DE #25] (parties stipulate that the Debtor was insolvent); Closing Trial Briefs [DE #44, 45] (arguing only the issue of reasonably equivalent value).

express factual determination as to whether the debtor received any value at all.").

The definition of "value" in section 548(d)(2)(A) of the Bankruptcy Code includes "property". Several courts in the Eleventh Circuit have broadly interpreted "property" in determining whether a debtor received value. *Pettie v. Ringo (In re White)*, 559 B.R. 787 (Bankr. N.D. Ga. 2016) (citing cases for the proposition that "[t]he Eleventh Circuit has rejected a limited definition of value"); *see also In re Phoenix Diversified Inv. Corp.*, No. 08-15917-EPK, 2011 WL 2182881, at *4 (Bankr. S.D. Fla. June 2, 2011) ("Among other things, value includes property of any kind."). Even intangible property can confer value on a debtor. *See, e.g., In re R.M.L., Inc.*, 92 F.3d 139, 148 (3d Cir. 1996) ("[T]he mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the [Bankruptcy] Code"). And a debtor can receive value directly or indirectly. *See, e.g., General Electric Corp. of Tennessee v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (citing *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2nd Cir. 1981), for the proposition that a transfer cannot be avoided if it "'confers an economic benefit upon the debtor,' either directly or indirectly"); *In re R.M.L., Inc.*, 92 F.3d at 149.

11

I.  <u>The Debtor did not Receive Anything of Value in Exchange for Enrollment or Tuition Payments Made on Behalf of Lembert and Ramirez.</u>

UM presented no evidence that the Debtor received any value in exchange for enrollment or tuition payments made for Lembert and Ramirez.  In late 2016, the Debtor paid $14,485.14 to UM on Lembert's and Ramirez's behalf.  Whether those payments were for tuition fees or some other type of charge, such as an enrollment fee, is unclear.

The Debtor filed for bankruptcy relief in January 2017, and the appointment of a chapter 11 trustee in February 2017 dispossessed the Debtor's pre-petition executives of their managerial control.  At that point, Lembert and Ramirez had not completed any courses, and therefore, they could not have imparted any value to the Debtor in the way of improved executive function.  Dr. Figuereo readily conceded as much on cross-examination, agreeing that the Debtor received no benefit from the tuition it paid on behalf of Lembert or Ramirez.

UM also failed to prove that any portion of the Lembert and Ramirez payments could be retained under section 548(c).  To prevail on a good-faith defense to a fraudulent transfer action, a transferee must demonstrate that it "gave value to the debtor,"

12

11 U.S.C. § 548(c), and must quantify such value. *See, e.g., In re Hannover Corp.*, 310 F. 3d 796, 799 (5th Cir. 2002); *In re TOUSA, Inc.*, 422 B.R. 783, 866 (Bankr. S.D. Fla. 2009) (citations omitted), *quashed in part*, 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012), *aff'd*, No. 10-CV-62035-KMM, 2017 WL 8785510 (S.D. Fla. Mar. 8, 2017). UM failed to prove that it gave anything of value to the Debtor in exchange for the payments made by the Debtor to UM on behalf of Lembert or Ramirez. Therefore, the Trustee can avoid and recover for the Debtor's estate the $14,485.14 in payments made by the Debtor in late 2016 on Lembert's and Ramirez's behalf.

II. <u>The Debtor Indirectly Received Value in Exchange for Tuition Payments Made on Behalf of Dr. Figuereo.</u>

In 2016, the Debtor transferred $54,169.26 to UM on Dr. Figuereo's behalf. Without question, UM gave value to Dr. Figuereo by providing networking opportunities and graduate education in several areas relevant to the operation of a health care business. Whether the Debtor derived reasonably equivalent value from Dr. Figuereo's educational and networking gains is the issue.

At trial, Dr. Figuereo testified that Dr. Ullman helped Dr. Figuereo in his attempts to negotiate a better reimbursement rate

13

from Blue Cross. It is unclear whether these efforts were successful and provided any value to the Debtor. The Court also cannot find that the Debtor derived value from Dr. Figuereo's guaranteed placement in the HEMBA program.

UM presented other credible and unrebutted evidence that the Debtor received a return on its investment in Dr. Figuereo's education. Dr. Figuereo testified that he implemented changes in the Debtor's collection department that markedly reduced the average collection time on accounts receivable in the year preceding the Debtor's bankruptcy filing. Improved collections of the Debtor's sizable accounts receivable, implemented by Dr. Figuereo based on skills he learned at UM, provided value in exchange for the transfers made to UM to pay Dr. Figuereo's tuition.

In analyzing the Debtor's actual and expected return on its educational investment, it is relevant to look at the amounts paid for Dr. Figuereo's tuition in comparison to the size of the Debtor's operations. Given the Debtor's significant gross income figures, the relative expenditure of $54,169.26 over a one-year period to train its chief executive in health-care business skills was a reasonable risk of a return on investment. Moreover, it is probable that even a small improvement in the Debtor's collection

14

activity would yield gains for the Debtor of at least $54,169.26. The Trustee testified that annual billings approximated $40-$60 million. $54,169.26 represents only about one-tenth of 1% of billings in that range. Assuming, conservatively, that annual billings averaged $40 million, the Debtor would have needed to collect only .11% more of its annual billings to break even on its investment. Therefore, if Dr. Figuereo implemented changes in the Debtor's collection department in 2016 that resulted in only slightly more than a tenth of a percent increase in collections, the Debtor's financial condition would have improved by more than the tuition expense.

The Court acknowledges that the Defendant did not present evidence quantifying the improvement in the collection of receivables. The Court is using these numbers and percentages simply to demonstrate that, given the tens of millions of dollars in receivables, even a very slight increase in collection efficiency could have provided benefits to the Debtor equal to, or greater than, the tuition payments.

III. The Trustee did not Satisfy his Burden of Proving that the Value Received was not Reasonably Equivalent to the Funds Advanced for Dr. Figuereo's Tuition.

The Trustee argues that the Debtor could not have received

15

anything of value reasonably equivalent to the $54,169.26 in payments it made to UM for Dr. Figuereo because the Debtor was hopelessly insolvent when it made the payments. Insolvency is an element of the avoidance claim, but insolvency does not establish the separate element, lack of reasonably equivalent value.

First, as discussed earlier, the Debtor had a reasonable expectation of obtaining a return on its investment when it paid Dr. Figuereo's tuition. So, even though the Debtor was insolvent and the investment did not prevent the company's demise, the investment is not avoidable because the Debtor's hope for a return on the investment was reasonable. *See In re TOUSA, Inc.*, 680 F.3d 1298, 1313 (11th Cir. 2012) ("The bankruptcy court correctly asked, 'based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return.'" (citation omitted)); *In re R.M.L., Inc.*, 92 F.3d 139, 142 (3d Cir. 1996) (A commitment letter issued in connection with a $53 million loan is not reasonably equivalent in value to the $515,000 in commitment fees paid for the letter "[b]ecause the commitment letter was so conditional that the chances of the loan closing were minimal.").

Second, the fact that the Debtor was insolvent and remained insolvent does not establish lack of reasonably equivalent value.

16

Even deepening insolvency after the transfers is not, alone, determinative of reasonable equivalency. *See, e.g., In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325, 1331-33 (11th Cir. 2002); *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 Fed. Appx. 925, 932 (11th Cir. 2015). If a debtor's insolvency grows, but the transfer at issue did not, independently, deplete the debtor's net worth, the transfer is not avoidable. *General Electric Corp. of Tennessee v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (citing *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2nd Cir. 1981)). Moreover, the facts of this case indicate that expenditures on Dr. Figuereo's education resulted in operational improvements that may have reduced the Debtor's insolvency between 2016 and 2017.

"[I]n determining reasonably equivalent value, the essential examination is a comparison of 'what went out' with 'what was received'." *Kapila v. WLN Family Ltd. P'ship (In re Leneve)*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006) (citing *Heritage Bank v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990)). Here, $54,169.26 went out, and improved collection of accounts receivables went in. As noted earlier, the Defendant did not present evidence quantifying the financial benefits

17

realized by the Debtor as a result of improved collection rates. However, "the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecommunication Network, Inc. v. Allen (In re Advanced Telecommunication Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007); *see also In re Berkman*, 517 B.R. 288, 302 (Bankr. M.D. Fla. 2014) ("[R]easonably equivalent value need not be dollar-for-dollar").

At the final pretrial conference, the Trustee conceded that the value does not have to be measurable:

> "We're not going to take the position that reasonably equivalent value requires that it be – – it be actually measurable ... we don't claim, and we're not going to claim that there must be measurable value. There just must be reasonably equivalent value."

Defendant's Ex. "T", Transcript of Pretrial Conference at p. 34: 14-21.

Once the Defendant proved that the Debtor received value, the Trustee had the burden of proving, by a preponderance of the evidence, that the Debtor did not receive reasonably equivalent value in exchange for the $54,169.26 that the Debtor spent on Dr. Figuereo. *General Electric Corp. of Tennessee v. Murphy (In re Rodriguez)*, 895 F.2d 725, 726, n.1 (11th Cir. 1990); *In re Leneve*,

18

341 B.R. 53, 56 (Bankr. S.D. Fla. 2006); *In re Berkman*, 517 B.R. 288, 300 (Bankr. M.D. Fla. 2014) (citation omitted). The Court finds that the Trustee failed to carry his burden. His hindsight analysis of insolvency neither addressed nor rebutted Dr. Figuereo's testimony regarding accelerated collection of accounts receivable and the positive effect that had on the Debtor's financial condition.

It is reasonable to conclude, based on the numbers, that the Debtor received value reasonably equivalent to the amount it expended on Dr. Figuereo's tuition. Moreover, when it paid Dr. Figuereo's tuition, its hope for a return on the investment was reasonable. Consequently, the Trustee cannot avoid the $54,169.26 in transfers made to UM on Dr. Figuereo's behalf.

### Conclusion

Whether fair consideration has been given for a transfer is "largely a question of fact as to which considerable latitude must be allowed to the trier of the facts." TOUSA, 680 F.3d at 1311(citations omitted). This trier of fact concludes that fair consideration was given here.

The Court will enter a separate judgment consistent with this opinion.

###

Copies Furnished To:

Matthew Lines, Esq.
Isicoff Ragatz
601 Brickell Key Drive, Suite 750
Miami, Florida 33131

Patrick Scott, Esq.
GrayRobinson, P.A.
401 E. Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301